FILED
2012 Oct-15  PM 01:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FRANCIS AMANDA MAY GLASS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number |
| **vs.** | ) | **2:11-cv-3330-AKK** |
| | ) | |
| **MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Francis Amanda May Glass ("Glass") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA").  This court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is supported by substantial evidence and, therefore, **AFFIRMS** the decision denying benefits to Plaintiff.

### I. Procedural History

Glass filed an application for Supplemental Security Income benefits under

Title XVI of the Social Security Act on February 12, 2009, alleging a disability onset date of October 15, 2005 due to bipolar disorder and learning disability. (R. 43, 105). After the SSA denied her application, Glass requested a hearing before an Administrative Law Judge ("ALJ") on October 5, 2009. (R. 50-52). At the time of the hearing on January 18, 2011, Glass was 23 years old with a ninth grade education. (R. 26-42). Glass has never engaged in substantial gainful activity and, thus, has no past relevant work. (R. 33).

On February 24, 2011, the ALJ denied Glass's claim. (R.16-23). Although the ALJ found that Glass has borderline intellectual functioning and bipolar disorder, (R.18), the ALJ concluded that Glass does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1, (R.18-19), that Glass has the residual functional capacity to perform a full range of work at all exertional levels but with some non-exertional limitations, (R. 19-22), that a significant number of jobs exist in the national economy that Glass can perform, (R. 22), and that Glass has not been under a disability, as defined by the Act, since February 12, 2009 (R. 23). On July 16, 2011, the Appeals Council refused to grant review. (R. 1-3). Glass then filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence."  *See id.*  (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 849 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the court must affirm the Commissioner's factual findings even if the preponderance of the evidence is against the Commissioner's findings.

*See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, it notes that the review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairments which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. § 404.1520(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)     whether the claimant is currently unemployed;

(2)     whether the claimant has a severe impairment;

(3)     whether the impairment meets or equals one listed by the Secretary;

(4)     whether the claimant is unable to perform his or her past work; and

(5)     whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"  *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to prior work the burden shifts to the Secretary to show other work the claimant can do."  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

## IV.  The ALJ's Decision

Turning now to the ALJ's decision, the court notes that, initially, the ALJ determined that Glass has not engaged in substantial gainful activity since February 12, 2009, and therefore met Step One of the five step analysis.  (R. 18). The ALJ then acknowledged that Glass had the severe impairments of borderline intellectual functioning and bipolar disorder, thus satisfying Step Two.  *Id*.  Next, however, the ALJ found that Glass failed to satisfy Step Three because "her impairments or combination thereof neither met nor equaled the requirements for any listed impairment."  *Id*.  Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ

proceeded to Step Four where she determined that Glass had the residual

functional capacity to

> perform a full range of work at all exertional levels but with the
> following non-exertional limitations: the claimant can understand,
> remember and carry out simple one and two step instructions and tasks.
> The claimant can maintain her attention and concentration for two-hour
> segments for simple tasks.  The claimant can tolerate occasional casual
> contact with co-workers, supervisors, and the public.  The undersigned
> concludes that all supervision should be direct and non-confrontational.
> The undersigned concludes that any workplace changes should be
> infrequent and gradually introduced.

(R. 19).  Lastly, in Step Five, the ALJ considered Glass's age, education, work

experience, and residual functional capacity, and determined that there are a

significant number of jobs in the national economy that Glass can perform, such as

packing/filling machine operator, hand packager, vehicle cleaner, janitor, presser

and inspector/tester.  (R. 22-23).  Because the ALJ answered Step Five in the

negative, the ALJ determined that Glass is not disabled.  (R. 23); *see also*

*McDaniel*, 800 F.2d at 1030.

## V.  Analysis

Glass asserts that the ALJ committed reversible error by (1) failing to

properly consider and apply the mental retardation listing, and (2) substituting her

own opinion for that of the medical experts.  Doc. 9 at 7-14.  For the reasons stated

below, this court finds that the ALJ's opinion is supported by substantial evidence.

### A.  Proper Consideration and Application of the Mental Retardation Listing

Glass first asserts that the ALJ erred in applying Listing 12.05C, which provides the requirements for a disability based on mental retardation.  Although the ALJ found that Glass's "mental impairments, considered singly and in combination do no meet or medically equal the criteria of listings 12.04 and 12.05[C or D,]" (R. 18), Glass appears to only challenge the ALJ's application of 12.05C.  Doc. 9 at 7. Listing 12.00 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 12 C.F.R. Part 404, Subpart P, App. 1, § 12.00.  Further, the specific criteria of section (C) requires that a claimant have "[a] valid verbal, performance, or full scale IQ of 60-70 and a physical or other mental impairment imposing an additional and significant work related limitation of function[.]"  *Id*. at § 12.05(C).  In her opinion, the ALJ reasoned that Glass did not meet the 12.05C criteria because "despite [Glass's] current IQ scores, the record shows that prior to age 22 the claimant exhibited IQs in the 80s and 90s[].  She maintains a diagnosis of borderline intellectual functioning, and she has a poor reading ability as noted during consultative examination."  (R. 19).

Glass does not dispute that her record shows she exhibited IQ scores in the 80s and 90s. Instead, she asserts that these scores are outdated and that the ALJ ignored a valid IQ score of 70 reported by the ALJ's own examiner Dr. Samuel A. Saxon and that this August 24, 2009 score is the only one the ALJ should have used because, unlike the score in the 80s and 90s, it is considered "current" under the regulations. Doc. 9 at 8. To support her contention, Glass asserts that the applicable regulation states that "IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above." *Id*. (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(D)(10)). Consequently, Glass asserts that the ALJ cannot rely on the scores in the 80s and 90s Glass obtained at age 14 since these scores became outdated when Glass turned 16. *Id*. at 9.

The court disagrees with Glass's assertion because the section Glass cites to support her contention is derived from Part B of the appendix, which specifically applies to "the evaluation of children under age 18 (where criteria in Part A do not give appropriate consideration to the particular disease process in childhood)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B. Although Glass is considered a "younger person," under age 50, for the purposes of disability determination, *see* 20 C.F.R. § 416,963(c), she is still an adult subject to Part A, which states only that

> [t]he results of standardized intelligence tests may provide data that help
> verify the presence of mental retardation or organic mental disorder, as
> well as the extent of any compromise in cognitive functioning.
> However, since the results of intelligence tests are only part of the
> overall assessment, the narrative report that accompanies the test results
> should comment on whether the IQ scores are considered valid and
> consistent with the developmental history and the degree of functional
> limitation.

20 C.F.R. Pt.404, Subpt. P, App.1, § 12.00(D)(6)(a).  Part A has no language

requiring the ALJ to disregard older or "outdated" scores.  Moreover, it is within

an ALJ's discretion to consider multiple IQ scores generated by different test

administrations.  *See Wilbon v. Commissioner of Social Security*, 181 Fed. Appx.

826, 829 (11th Cir. 2006).  Therefore, the ALJ properly considered the IQ testing

results Glass obtained at age fourteen in the analysis for disability under Listing

12.05(C).

### B.  *Proper Consideration of the Medical Experts' Reports*

Glass contends next that the ALJ erred by purportedly substituting the

ALJ's own opinion for that of the treating and examining medical experts.  Doc. 9

at 9.  Specifically, Glass takes issues with the weight the ALJ assigned to each

medical expert's report and the ALJ's reliance on reports in the record concerning

Glass's daily activities.  As shown below, based on a review of the relevant

evidence in the record and the weight the ALJ assigned to it, Glass's contentions

miss the mark.

Beginning with Glass's educational records, the court notes that on November 14, 2001, the Chilton County School System conducted several assessments on Glass to determine whether she needed special education services. (R.142).  Glass's full scale IQ score was listed as 89, based on a February 12, 1998 test, which the school characterized as "overall low average mental ability."  *Id.* Glass's school records also indicate that she performed at or slightly below average on most other assessments and her report cards show that she performed at an average level but received failing grades for "noncompliance with attendance" requirements.  *Id.* at 142-145, 148.  Ultimately, the school determined that Glass had "specific learning disabilities" and deemed her eligible for special education services.  *Id.* at 146.  Glass dropped out of school after completing the ninth grade, but indicated during the hearing before the ALJ that she took a vocational class during high school that began teaching her to work basic jobs at Wal-mart.  *Id.* at 30,36.

To aid in the disability determination process, Dr. Saxon performed a consultative disability determination evaluation on Glass on July 20, 2009. (R.169).  Based solely on Glass's own representation about her daily life and educational history,  Dr. Saxon concluded that Glass is "intellectually challenged

and illiterate and certainly incapable of managing financial affairs" and that Glass

"in fact, is a dependent adult."  *Id.*  In his diagnostic impression, Dr. Saxon noted

that Glass suffered from "[l]earning disabilities and mental retardation in all

probability though no actual testing was done.  While there is some reference to

her having Attention Deficit Disorder and hyperactivity, I suspect that her

diminished cognitive and intellectual ability is a more important and limiting

factor."  *Id*.  Finally, based on Glass's subjective representations, Dr. Saxon

assigned Glass a global assessment of functioning ("GAF")[1] score of

approximately 40-45.  *Id*.

Following this subjective assessment, Dr. Saxon saw Glass again on August

24, 2009 and administered the Wechsler Adult Intelligence Scale-IV.  (R. 172).

The test resulted in a Composite Full Scale IQ Score of 70, which Dr. Saxon

described as reliable because Glass "respond[ed] to it in a very straightforward,

valid fashion putting forth good effort."  *Id*.  Dr.  Saxon's diagnostic impression

noted ADHD by history and Specific Learning Deficits at Axis I, and Borderline

---

[1] The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000), presents the GAF Scales, which is widely used to score the severity of psychiatric illnesses.  A GAF score of 40-45 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." These scores are relevant to analyzing the severity of any impairment a claimant suffers from in order to determine whether the requirements of prong two of Listing 12.05C are met.

Mental Retardation at Axis II.  *Id*. at 173.  Ultimately, Dr. Saxon concluded that Glass "is not capable of independent living and will no doubt remain with her mom for sometime to come."  *Id*.

Four days later, on August 28, 2009, Robert Estock, M.D., the state agency medical consultant, performed a psychiatric review of Glass's record and noted that Glass suffered from specific learning deficits, borderline mental retardation, previously suffered from ADHD, and described Glass's functional limitations as either mild or moderate.  (R. 174-75, 177).  After reviewing Glass's medical and educational records, Dr. Estock concluded in his functional capacity assessment that

> A.  The claimant can understand, remember, and complete short, simple 1- to 2-step tasks, but not those that are longer or more detailed[,] . . . can learn and remember a simple work routine if provided sufficient rehearsal[, and] . . . can follow simple directions in order to find locations and complete tasks.
>
> B.  The claimant can maintain attention sufficiently to complete simple 1- to 2- step tasks for periods of at least 2 hours, without the need for special supervision or extra rest periods[,] . . . would not have any problem with the complexity of various tasks due to cognitive restraints, but may have some difficulty with the attention and concentration that is required[, and] . . . may be able to complete more complex tasks if they are broken down into smaller, simpler sections to be completed.
>
> C.  The claimant can tolerate non-intense interaction with members of the general public[,] . . . can ask questions and request assistance[,] . . . can tolerate casual, non-intense interaction with coworkers and

supervisors[,] . . . is likely to do best working with a small number of familiar coworkers[,] [s]upervision and criticism should be given in a manner that is supportive and nonthreatening[, and] [t]he claimant can maintain basic standards of personal hygiene and grooming.

D.   Changes in the work environment or expectations should be infrequent and introduced gradually.  The claimant can maintain basic awareness of safety issues in the work place [and] . . . can use public transportation to get to work.

(R. 190).

The next medical entry occurred on April 19, 2010, when Glass visited the

Chilton-Shelby Mental Health Center ("CMHC") and completed an initial intake

form. (R. 197).  Based on Glass's subjective representations on the intake form,

Jade Witt, LPC, listed Glass's GAF score at 50[2] and noted that Glass suffered from

bipolar disorder and a learning disorder at Axis I but had no diagnosis on Axis II.

*Id*. at 201.  On May 18, 2010, Glass again presented at the CMHC to receive a

treatment plan and authorization for services.  Nurse Witt noted that Glass had "no

reports [of] mental health treatment," and that although Glass suffered from some

"deficits with basic living skills," Glass can improve.  *Id*. at 193, 195.  Indeed, as

discussed below, Glass showed marked improvement the last two times she

presented to CMHC.

At her first actual assessment at CMHC on October 5, 2010, Glass met with

---

[2] A GAF score of 50 indicates the same symptoms as a score of 40-45.

Dr. Lucas, who noted that Glass "presented with dysphoric mood[,] reports anger and irritability[,] reports poor sleep with nightmares[, and] describes herself as sad." (R. 205). Dr. Lucas diagnosed Glass as suffering from bipolar disorder at Axis I, learning disorder/borderline intelligence at Axis II, assigned Glass a GAF score of 46-50 at Axis V, and noted that he could not prescribe medications because Glass was pregnant. *Id*. On December 14, 2010, after giving birth, Glass visited CMHC for the final time and Dr. Lucas indicated that Glass still suffered from bipolar disorder at Axis I but has only a learning disability at Axis II. *Id*. at 204. Further, Dr. Lucas noted that Glass's GAF score had improved to 51-55[3] and that Glass presented with "appropriate affect, fair sleep and appetite." *Id*. Finally, although Dr. Lucas discussed the benefits of medication, he prescribed none during this visit. *Id*.

Having reviewed the full record, the court turns again to the ALJ's opinion. Since Glass's contention of disability is based primarily on the 70 IQ score Dr. Saxon assigned her, the court notes that, under Listing 12.05C, "a valid I.Q. score is not conclusive of mental retardation if the score is inconsistent with other

_____

[3] A GAF Score of 51-55 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). American Psychiatirc Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

evidence in the record on the claimant's daily activities and behavior." *Whetstone v. Barnhart*, 263 F. Supp. 2d 1318, 1325 (M.D. Ala. 2003) (internal quotation marks omitted) (quoting *Lawery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992). Rather, in determining the weight to give an IQ score, the ALJ must consider medical reports, daily activities, behavior and other evidence in the record. *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986). This is precisely what the ALJ did here as related to Dr. Saxon. Specifically, consistent with the law, the ALJ considered Glass's daily activities and behavior in determining to afford more weight to the IQ scores Glass obtained while in school.

Moreover, with respect to medical evidence in general, "unless good cause is shown to the contrary," the ALJ must accord "substantial weight or considerable weight to the opinion, diagnosis, and medical evidence of the claimant's treating physician." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). Such "good cause" for disregarding medical opinions exists where a physician's opinion is unsupported by objective evidence, is contradicted by other opinions which are supported by such evidence or is merely conclusory." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004). Here, the ALJ in fact afforded proper weight to the opinions of Dr. Lucas from CMHC, Glass's only treating physician, which showed marked improvement with an increased GAF

score of 51-55 and no diagnosis of mental retardation.[4]  Based on this report, the ALJ concluded that the record did not support Dr. Saxon's finding that Glass had a GAF of 40-45, especially in light of the evidence concerning Glass's level of functioning.  (R. 21).  Notwithstanding Glass's contentions to the contrary, the court finds that the ALJ committed no error in not affording significant weight to the subjective opinions of Dr. Saxon, which are directly contradicted by the objective findings and information about Glass's independent daily activities contained in the record .

Likewise, rather than grant significant weight to the May 18, 2012 CMHC report, which was "not support[ed] by *objective* medical evidence," *id*. (emphasis added), the ALJ gave significant weight, instead, to Glass's testimony that she "was independent in her activities of daily living (i.e., care for her children, clean her home, and perform yard work)"[5] and to Dr. Estock's objective review of Glass's medical history.  *Id*.  The ALJ also properly disregarded the intake form and therapist's opinion because they were also based solely on Glass's subjective

_____

[4] This increased GAF score is evidence that, despite an IQ score between 60 and 70, Glass does not satisfy the remaining requirements of Listing 12.05(C), a "deficit[] in adaptive functioning" and "other physical or mental impairment imposing an additional and significant work related limitation of function."  12 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00 and 12.05(C).

[5] The record also indicates that Glass shops and buys groceries with her mother, cares for her two children on her own all day, prepares small meals, cleans the house, and completes other chores like mowing the lawn.  *Id*. at 36-27, 118, 124.

assertions.  Accordingly, the ALJ did not err in  assigning weight to the medical evidence contained in the record and her opinion is supported by substantial evidence.

Lastly, Glass argues that the ALJ "dismiss[ed] examining source records at her whim" and that "if the ALJ truly had some doubt as to the testing results or opinion of her own psychological examiner, Dr. Saxon, it was incumbent upon her to re-contact Dr. Saxon rather than interpret those results to the detriment of Plaintiff[.]" Doc. 9 at 9.  In other words, the ALJ purportedly has an obligation to reconvene and meet with a physician before rejecting findings that are favorable to a claimant.  Unfortunately, this contention has no legal foundation.  Indeed, the regulation Glass relies on to supplant this assertion states only that

> [i]f the report is *inadequate or incomplete*, we will contact the medical source who performed the consultative examination, give an explanation of our evidentiary needs, and ask that the medical source furnish the missing information or prepare a revised report.

20 C.F.R. § 416.919p(b) (emphasis added).  There is no evidence here that Dr. Saxon's report was inadequate or incomplete.  Rather, he issued findings based solely on Glass's subjective reports and findings that the medical record contradicted.  Therefore, the ALJ had no duty to further consult Dr. Saxon prior to making the determination that Glass did not satisfy the listing requirements for disability under 12.05C.

## VI.  CONCLUSION

Based on the foregoing, the court concludes that the ALJ's determination that Glass is not disabled is supported by substantial evidence, and that the ALJ applied proper legal standards in reaching this determination.  Therefore, the Commissioner's final decision is **AFFIRMED**.

**DONE** the 15th day of October, 2012.


_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE